Mr. Justice James
delivered the opinion of the court.
This petition sets forth substantially that, on February *317 12,1871, an agreement was concluded between tbe American Minister at Madrid and tbe Minister of State of Spain, for the settlement of certain claims of citizens of the United States on account of injuries committed by the authorities of Spain in the Island of Cuba; that, in pursuance of its terms, a commission, generally known as the “Spanish-American Claims Commission,” was established, and the testator, Joaquin Garcia de Angarica, filed before it a claim against the Spanish government, upon which there was duly awarded a judgment in his favor for the sum of $748,180.00; that. Spain paid to the Secretary of State of the United States, to the use of the testator, and to be applied to the satisfaction of that award, the full amount of said judgment with interest thereon, in two payments, to wit, March 27, 1877, the sum of $404,939.62, and on October 8, 1877, the further sum of $418,191.61, making in the aggregate $823,131.23; that, upon the receipt of said sums, it became the lawful duty of the Secretary of State to at once pay the whole amount thereof in satisfaction of the award, but that, in making such payment, the Secretary actually withheld the sum of $41,129.74, claiming to retain the same until such time as the Spanish government should make provision for the payment of the expenses of the arbitration, in compliance with the following clause of the convention: “The expenses of the arbitration will be defrayed by a percentage to be added to the amount awarded that such retention was wholly without authority of law, either by virtue of the agreement or of any statute or otherwise, and that the petitioner protested against it and duly demanded the payment of said sum of money, but that the said Secretary and his successors in office continued unlawfully to retain the same until the 12th day of February, 1885, when the precise sum of $41,129.74 was paid to petitioner; but the petitioner alleges that, at the time of receiving this retained sum, the then Secretary of State caused it to be invested in bonds of the United States, with the intent of paying the interest thereon earned during the period of retention together with the principal sum, to *318 the person entitled to receive the principal sum, and that said Secretary notified the testator of this intention in a certain circular letter, and repeated the same in a subsequent letter to petitioner’s attorneys. It is alleged that the retained five per centum of testator’s award stood invested in these securities from the time of its receipt from Spain, until about the 9th day of February, 1885.
The remainder of the .petition gives the history of petitioner’s efforts to obtain payment to her of the interest earned on what she claims to be a fund in the hands of the Secretary of State belonging specifically to her, and of the refusal of Mr. Secretary Frelinghuysen and of Mr. Secretary Bayard to account for such interest and their reasons for so doing.
The respondent denies that any award was made in favor of Angarica, but says that an award for a like sum was made in favor of the United States, and that Angarica was not a party to any proceedings at any time pending before the Spanish-American Claims Commission; and, as. a consequence, denies that the moneys referred to were paid to the Secretary of State to the use of Angarica, and claims that they- came into his hands coupled with duties to the United States which were superior to any duty in the premises to the petitioner’s testator; and that, as soon as the Government of the United States assumed to urge and prosecute the testator’s claim against Spain, it became thenceforth, in contemplation of law, subject to the will of the Government of the United States, and entirely beyond the control of the testator; and, further, that, in investing the moneys arising from the award, the Secretary of State acted in the performance of a general statutory duty and not for the use and behoof of the testator. As to the alleged agreement of the Secretary of • State to pay to the several claimants the interest accruing on such investment, he denies that any such agreement was or could be made, and finally he claims that the United States is never bound to pay interest to its citizens for the detention of money.
The necessary ground of an application for the writ of *319 mandamus against an executive officer is, that it shall appear that he has been charged by law with the performance of a specific official duty, to which the petitioner is entitled, and that he refuses to perform that duty. The petitioner in this case claims to have shown, in accordance with this rule, that the Secretary of State is charged with an official duty to pay over to her the moneys in question as part of a fund belonging to the estate of her testator, and that this is a duty as to which he has no discretion. We have therefore to consider, first, with what duties this executive officer is charged by law.
Section 202 of the Revised Statutes provides that: “The Secretary of State shall perform such duties as shall from time to time be enjoined on or entrusted to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs as the President of the United States shall assign to the Department; and he shall conduct the business of the Department in such manner as the President shall direct.” This is the only law relating to the duties of that officer in matters of foreign intercourse.
Under this statute it is his duty, in the conduct of every matter which constitutes a part of “the business of his Department,” to act “in such manner as the President shall direct,” and it appears that every transaction connected with foreign intercourse, which the President shall assign to the State Department, is a part of its business in which he is so to act. If, then, the receipt from Spain and the payment over to the respective claimants of the moneys awarded by the commission, are acts done by the Secretary of State in his official capacity — and it is only in such case that he could be subject to a writ of mandamus' — it is because that matter has been made by the President a part of the business of.his Department. It *320 follows that this official duty must be performed “ in such manner as the President shall direct.” Now it has been decided by the Supreme Court of the United States that the action of the heads of executive departments, in matters which the President is authorized to direct, must be presumed to have been directed by him. We must therefore presume that the Secretary of State has acted by the specific direction of the President in the decision complained of by the petitioner. Whatever might be thought of the propriety of such directions, the Secretary has, in that case, done simply what the law required him to do. In other words, having been directed by the President not to pay to the petitioner the interest derived from the investment of these moneys, it was, so far as he was concerned, his legal duty not to so pay them. It may be added that this presumption of direction by the President is not, in a transaction of such character and importance, merely a theory. As a matter of fact, such business is conducted with his actual concurrence.
It may be that a power and duty as to such payments, independent of the President’s control, may be vested in the Secretary of State by the terms of a treaty; for a treaty would be the law of the land, as much as the statute to which we have referred. But this agreement between the American Minister at Madrid and the Spanish Minister of State was not a treaty, and its terms could not modify the operation of a statute, even if they had been intended to do so. As a matter of fact, it contains nothing relating to any power or duty of the Secretary of State, except a provision that he shall name one of the arbitrators. His official duty is governed therefore by the statute, and a refusal to perform a duty imposed by that statute has not been shown.
Another element, to be considered in determining whether we are authorized to apply the remedy of mandamus, is the nature of the petitioner’s right. We are of the opinion that, however plain the political obligation of this Grovernment, or of its executive, may be to account to the in *321 dividual citizen for moneys awarded in compensation of injuries, received from a foreign government and done to him, and for any increment on such wronsg, the right of the citizen is not of such a nature that it can be enforced by this remedy; nor, indeed, do we perceive that any judicial remedy for its enforcement can exist without further legislation.
When one nation treats with another on account of wrongs done to one of its citizens, the transaction is wholly between the two nations. The injured citizen bears no relation, in the proceedings, to the nation on which the claim is made, and is in no sense a party to the adjustment, even though his own government assumes to make the reclamation for his benefit. But his own government may, in connection with the transaction, assume a direct relation with and obligation to him in respect to the indemnity obtained. Indeed, every nation owes to its citizen a duty to protect him against foreign injuries, and to procure for him, when considerations of the common welfare do not prevent it, indemnity for those injuries: and when the state actually intervenes for the very purpose of obtaining such indemnity for him, it recognizes that duty and assumes an obligation to see that he enjoys it.. In such a case we conceive that the obligation is manifest, but, in determining the remedy for its enforcement, the question is, what is the nature of that obligation? Does it constitute a legal duty on the part of the state, or of the executive who is authorized to perform it, and establish a legal right on the part of the citizen, in the sense of those terms which is employed by the courts in the administration of municipal law? Clearly it is not an obligation of contract. It arises from a relation which needs no h-elp from contract and cannot be strengthened by contract; that is to say, from the very relation of Government and citizen. It would seem, then, to be merely a part of the state’s political obligations, and to consist essentially of that general, though very binding, obligation of protection which, by its very origin and constitution, the state owes to the citizen. *322 Such an obligation may be absolute without being enforceable. And we do not mean to intimate that it is less binding than the legal obligation of contract or than the obligation of an ordinary trust. If there can be any difference, it is more binding; for nothing can equal the stringency and inevitableness of an obligation of public morality and good faith of the obligations of a community in its dealings with the individual citizen, whom it has stripped of all means of compulsion. We intend, therefore, merely to say that, however strong this obligation may be in a political sense, it contains none of the elements of what is known to the courts as contract; and that much less can it be held by the courts that an indemnity, obtained by the state for the benefit of an injured citizen, becomes in a legal sense at once the property of that citizen, or property held for his use. The phrases and analogies of municipal law are constantly found to be misleading in such matters. This transaction established in that sense neither a debt nor a trust nor any trustee. It does not appear, therefore, that the petitioner has such a right as can be enforced by legal remedies. Clearly it cannot be enforced by the writ of mandamus.
These conclusions are sufficient to dispose of the application before us, but, as we were invited by the course of the argument, as well on the part of the respondent— virtually of the Government — as on the part of the petitioner, to consider the actual predicament of this fund, we deem it proper to do so.
We observe that the respondent claims that the retained moneys were invested under the requirement of a general law, and he refers to section 3659 of the Revised Statutes. The meaning of this proposition seems to be, that therefore the investment was not^an act done by the executive in the exercise specifically of his powers in the management of a diplomatic reclamation, and that therefore the increment cannot he said to have been, as a matter of fact, devoted by executive action to the use of the claimants.
The section referred to provides that: “All funds held *323 in trust by the United States, and the annual interest accruing thereon, when not otherwise provided by treaty, shall be invested in stocks of the United States, bearing a rate of interest not less than five per centum per annum.” This provision was taken from section 2 of the act of September 11, 1841, (5 Stat., 465), and it is necessary to look back to the original in order to ascertain its full meaning. The first section of the act of 1841 related to the Smithson fund. An earlier act, of July 7, 1838 (5 Stat., 267), had provided that the moneys arising from the bequest of James Smithson were thereby appropriated, and should be invested by the Secretary of the Treasury in the stocks of States, bearing not less than five per cent; interest, and that these stocks should be held by him “in trust for the uses specified in the last will and testament of the said Smithson, until provision should he made by law for carrying the purpose of said bequest into effect, and that the annual interest on these stocks should he “in like manner invested for the benefit of said institution.” This section was repealed by the act of 1841, which provided instead that the Secretary of the Treasury should, until Congress should appropriate “said accruing interest to the purposes prescribed hy the testator for the increase and diffusion of knowledge among men, invest said accruing interest in any stock of the United States,” &o. Then the original form of section 2 was as follows: “That all other funds held in trust by the United States, and the annual interest accruing thereon . . . shall, in like manner, be invested in stocks of the United States,” &c. The words “in like manner” had the effect of requiring all investments within the statute to be made by the Secretary of the Treasury. Neither these words nor any equivalent are found in the revision, but, according to a well settled-rule, the omission is supplied by reference to the original act; and we hold that under section 3659 the trust moneys there referred to must be invested by the Secretary of the Treasury. We are of opinion also that, in all cases within the statute the securities are to be retained by him, inasmuch as he is to *324 reinvest tbe accruing interest, and that they cannot be sold and the proceeds paid out, as was done in this case, without further authority of law.
It is apparent from these requirements that the statute relates only to a class of trusts which cannot be interfered with or disposed of by executive power without further legislation, and this construction is supported by contemporaneous facts and other statutes. At the time of the enactment of 1841 there existed certain treaties with the Indians, containing stipulations for the payment to them, annually, of interest upon the proceeds of lands ceded by them; and it had already been provided by the act of January 9, ISST (5 Stat., 135), which is now embodied in the Revised Statutes as section 2096, that these funds should be invested'in securities at not less than five per cent, interest. It was clearly for trusts of this definite character, established as we have said, by law, that the act of 1841 proposed to establish a general system. This ih especially indicated by the exception in that act of cases regulated by treaty. The reference is to these Indian treaty funds. We think, then, that the statute did not apply to the transaction in question, and it is evident that the executive did not propose to conform to its requirements. As the circular letter of the Secretary of State informed Mr. Angarica, the Department of State proposed to keep this reserve invested, and only temporarily; while trust funds under the statute were to be held by the Secretary of the Treasury until disposed of according to the will of Congress. As the executive could not fail to know that he could not lawfully sell trust securities that were within the statute, and disburse the proceeds, without legislative authority, it is plain that he assumed and decided to treat this fund as of a different character and wholly within executive control.
These considerations are important in determining what the intention and effect of the transaction actually were; and it is only for that reason that'we have been careful to state them. We proceed to consider those questions.
We have said that a state owes to its citizen, when the *325 common welfare does not prevent such intervention, a duty to procure for him indemnity for foreign injuries, and that, when it actually intervenes for that purpose, it assumes an obligation to see that the indemnity enures to his benefit. The agreement with Spain expressly recognized this duty. It is entitled: “Memorandum of an arbitration for the settlement of the claims of citizens of the United States, or of their heirs, against the Government of Spain for wrongs and injuries committed against their persons and property, or against the persons and property of citizens of whom the said heirs are the legal representatives, by the authorities of Spain in the Island of Cuba/’ &c. Although, as we have said, the individual claimant bears no relation as such to the foreign government in such an arbitration, his interest is here provided for by a plain declaration that, as between himself and his own government, the arbitration is in his behalf and for his benefit. In pursuance of this intention the last article of the agreement .declares that: “The two Governments will accept the awards made in the several cases submitted to the said arbitrators as final, and conclusive, and will gue full effect to the same as soon as possible.” On the part of the United States this included an engagement that the payments made on the awards should enure to the benefit of the claimants, and, inasmuch as it was not then foreseen that any omission or default would occur in providing for the expenses of the arbitration, the meaning of this engagement was further that the whole amounts of the several awards should go to them. We do not mean, however, to express any opinion as to the legitimacy of the temporary retention of five per centum of these amounts, with reference to the unpaid expenses. The agreement is referred to only as one of the means of ascertaining the meaning of the steps which followed, and especially what was decided by the executive who had in charge the function of deciding. We find that the Secretary of State informed the claimants that five per centum of the awards would “be reserved for the present, to meet the expenses of the commission, until a payment to cover such *326 expenses shall be made by Spain,” and that in his report to the President, which the latter transmitted to the Senate, he said: “ The reserve of five per centum may be regarded as provisional only,” and, finally, that in his circular letter to the claimants, he said: “It is hoped that no great delay will occur in receiving the payment from Spain which will liberate this reserve for expenses, and the Department will expect to keep this reserve invested in interest-bearing securities of the United States to cover the delay in the distribution to the claimants.”
These expressions disclose the intention of the executive and determine its effect. This statement to the claimants meant that, notwithstanding the arrangement was provisional, and might end in a permanent retention of the reserve, yet, in case it should be released, the investment should stand as one made in order to cover the loss suffered by them, from the delay in paying the balance ultimately held to he due them; in other words, that it was provisionally an investment in trust for their benefit. This was not an “agreement” with the claimants, as the petitioner insists, nor was it, on the other hand, the announcement merely of a present intention; it was an executive decision, made in the performance of a duty included in this executive intervention. As in the case of an ordinary legal and enforceable express trust, the nature of the transaction is defined by the party who originates it, so the nature and effect of this administrative transaction was defined and established to be at once in the nature of a provisional trust for the benefit of the claimants. We assent to the respondent’s statement in his letter of October 16, 1885 (set forth in the petition), and in his answer, that this reserve was a trust fund, hut we hold that,.instead of being a trust under the statute, it was a trust established by an act of executive discretion. We have already concurred, also, in the opinion stated by him in the same letter, that “ it is res judicata that the Secretary of State has not discretionary power to dispose of the accumulations resulting from investments made in pursuance of the-act of September 11,1841,” *327 hut we hold that the restrictions of that act do not apply to a trust contrived as merely a part of the management of a diplomatic intervention in behalf of a citizen, and that the executive was entirely at liberty to perform that trust completely by disposing of the whole of its proceeds. And it may be added that he clearly undertook to exercise this very power, when Mr. Secretary Frelinghuysen, in February, 1885, paid over to the claimants that part of the proceeds of the trust fund which represented the principal sum invested. If the investment had actually been within the statute he could not lawfully have done this, nor would it be true that the respondent may, as he proposed to do in the letter referred to, “cause the accumulations to pass into the Treasury,” inasmuch as the statute would require it to be reinvested and retained by the Secretary of the Treasury, and not confused with the general funds.
We conceive, then, that these accumulations-cannot be withheld from the use declared in this executive trust, without reversing the original executive decision and disregarding the effect of the executive action by which the transaction was moulded and defined. Of course, in case of subsequently discovered fraud, or of plain mistake of fact or law, a later executive could not hesitate to treat the whole matter as an original question, notwithstanding a former decision; but in the absence of these conditions, the settled practice of this Government has been, as the respondent stated in his letter to petitioner’s attorneys of October 7, 1885, to treat the former executive action as conclusive. But the conclusiveness of the original action in this case stands on far stronger ground than the rule which treats mere decisions as conclusive. It stands on the principle that a trust once established is not to be undone because the trustor afterwards disapproves of his own act any more than a contract or conveyance may. Although this was not of that class of trusts with which courts of equity deal, as we have already said, yet the principle which we have stated applies to it and governs its administration. When it was decided that this fund should no *328 longer be reserved, tbe provisional element of tbe transaction determined, and tbe provisional trust became unconditional. According to tbe rule referred to, tbe increment incorporated in it bas retained tbe character of trust originally stamped upon it by tbe Executive. As we bave said, however, this trust is not enforceable, and tbe petition is accordingly dismissed.